**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------ X



PETER TRIPP, on behalf of himself and all
others similarly situated,

Civil Action No. _____

Plaintiff,

CLASS ACTION

v.

COMPLAINT BASED UPON SELF-
DEALING AND FOR BREACH OF
FIDUCIARY DUTY

GIANT INTERACTIVE GROUP INC.,
YUZHU SHI, WEI LIU, XUEFENG JI,
ANDREW Y. YAN, PETER ANDREW
SCHLOSS, JASON NANCHUN JIANG,
GIANT INVESTMENT LIMITED, and
GIANT MERGER LIMITED

X

Defendants.

------------------------------------------------------

## SUMMARY OF THE ACTION

1. This is a class action brought by plaintiff Peter Tripp ("Plaintiff") on behalf of holders of Giant Interactive Group Inc. ("Giant" or the "Company") American Depository Shares ("ADSs") against Giant, the members of Giant's Board of Directors (the "Board" or the "Individual Defendants"), Giant Investment Limited ("Parent"), and Giant Merger Limited ("Merger Sub" and with Parent, the "Buyout Group"), in connection with a definitive Agreement and Plan of Merger (the "Merger Agreement") entered into by Giant, Parent, and Merger Sub (the "Merger"). This action arises out of defendants' pursuit of a sale of the Cayman Islands-incorporated Company to the Buyout Group at an unfair price through an unfair and self-serving process, in violation of the fiduciary duties owed to the Company's public ADS holders.[1]

2. Giant is an online game developer and operator in China. It focuses on massively multiplayer online role-playing games (MMORPG) that are played through networked game servers, in which a number of players are able to simultaneously connect and interact. The Company operates thirteen online games, among which ten are self-developed.

3. The Company has built nationwide distribution and marketing networks to sell and market its prepaid game cards and game points. As of December 31, 2012, its distribution network consisted of more than 11 non-exclusive regional distributors and reached over 99,000 retail outlets, including internet cafes, software stores, supermarkets, bookstores, newspaper stands and convenience stores throughout China.

---

[1] Although the Company is incorporated in the Cayman Islands, this Court has previously held that there is no actual conflict between the law of the Cayman Islands and New York law with respect to breach of fiduciary duty claims. *Refco Inc. Sec. Litig. v. Aaron*, 826 F. Supp. 2d 478, 500 (S.D.N.Y. 2010) (comparing the elements of a fiduciary duty claim in the Cayman Islands to one in New York and finding that "[b]ecause there is no actual conflict of law, new York law governs the claims for breach of fiduciary duty against [a defendant] arising from his position on the Board. 'In the absence of substantive difference . . . a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it.'") (quoting *IBM v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004)).

1

4.        On March 16, 2014, the Company announced that it had entered in the Merger Agreement pursuant to which the Buyout Group will acquire the Company (the "Proposed Transaction"). Under the terms of the Merger Agreement, the Buyout Group will purchase the entire Company for $12.00 per share or ADS in cash (the "Proposed Merger Consideration"). Upon completion of the transaction, Giant will be a wholly-owned subsidiary, which will have effectively transformed the Company from a public entity to a privately-held entity.

5.        The Proposed Transaction is the product of a hopelessly flawed sales process that was designed to ensure the sale of Giant to the Buyout Group on terms preferential to defendants and to subvert the interests of Plaintiff and the other public ADS holders of the Company. The Proposed Transaction is being driven by Giant's Chairman of the Board, defendant Yuzhu Shi ("Shi"), who, along with his affiliates in the Buyout Group, beneficially own approximately 49.3% in the aggregate of the issued and outstanding shares of the Company.

6.        The Proposed Merger Consideration of $12.00 per ADS drastically undervalues the Company's prospects and is the result of an entirely unnecessary sales process. Twelve dollars per ADS is a paltry 5.26% premium over the $11.40 closing price of the Company's ADSs on March 14, 2014—the last trading day before the announcement of the Merger Agreement. The Individual Defendants attempted to distract from their failure to shop the Company and the inadequate Proposed Merger Consideration by touting an illusory premium over the November 22, 2013 closing price of $10.13 per ADS, claiming the Proposed Merger Consideration represents an 18.5% premium over this unaffected price. Of course, this supposed premium provides convenient cover for the Company, particularly since the November 22, 2013 announcement was orchestrated by the Company to inflate any potential premium in light of the fact that the Company's ADS price had continually risen throughout the nearly eleven months prior to the November announcement.

In fact, from January 2, 2013 (closing price of $5.56 per ADS) to November 22, 2013 ($10.13 per ADS), the Company's price had increased an astounding 82 percent. As such, the November takeover announcement was a calculated maneuver by the Company to curb any continued growth for the Company and cap the price the Buyout Group would have to pay for the Company.

7.     Moreover, defendants agreed to the Proposed Transaction in breach of their fiduciary duties to Giant's public ADS holders, which they brought about through an unfair sales process. Rather than undertake a full and fair market check designed to maximize ADS holder value as their fiduciary duties require, the Board catered to their own liquidity goals and the plan of defendant Shi.

8.     The Individual Defendants' actions of curbing the upside value of the Company to cap any potential merger consideration is especially egregious in light of the fact that the Proposed Transaction itself is only subject to approval by two-thirds of the Company's ADS holders in a yet-to-be-scheduled vote. In light of the fact that the Buyout Group already holds more than 49% of the Company's shares outstanding, the Proposed Transaction is actually contingent on the affirmative vote of just 17% of the Company's ADS holders.

9.     To protect against the threat of alternate bidders making an offer superior to the Buyout Group's, defendants have implemented preclusive deal protection devices to guarantee that the Buyout Group will not lose its preferred position. These deal protection devices effectively preclude any competing bids for Giant.

10.     Those deal protection devices include: (i) a no-shop clause that precludes the Company from soliciting potential competing bidders; (ii) a matching rights provision that requires the Company to disclose confidential information about competing bids to the Buyout Group within forty-eight hours of receipt and allow it to match any competing proposal; (iii) a "Don't

3

Ask, Don't Waive Standstill" provision that makes it impossible for any other potential entity that has entered into a standstill agreement with the Company to re-enter the negotiation process and offer a deal above the Buyout Group's; and (iv) a termination and expense fee provision that requires the Company to pay the Buyout Group $40,275,000.

11.     As detailed herein, defendants breached their fiduciary duties, and aided and abetted such breaches, by conducting a flawed sales process designed to deliver the Company to the Buyout Group and provide material benefits to Company insiders. As a result, the Board failed in its duty to secure the best price possible for the Company's ADSs. and exacerbated their breaches of fiduciary duty in the sales process by agreeing to lock up the Proposed Transaction with preclusive deal protection devices.

12.     To remedy defendants' breaches of fiduciary duty and other misconduct, Plaintiff seeks, *inter alia*: (i) injunctive relief preventing consummation of the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain a transaction that provides the best possible terms for the Company's ADS holders; (ii) a directive to the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of Giant ADS holders; and (iii) rescission of, to the extent already implemented, the Merger Agreement, or any of the terms thereof.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) because Plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs and interest. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

4

14. Additionally, this court has jurisdiction over Giant because its ADSs trade on the New York Stock Exchange. By virtue of this connection, each other defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15. Venue is properly laid in this judicial district pursuant to 28 U.S.C. §1391(a) because the Company ADSs trade freely on the New York Stock Exchange, headquartered within this district and the defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

16. Plaintiff, a citizen of California, is and was at all times relevant hereto the holder of Company ADSs.

17. Defendant Giant is a Cayman Islands-incorporated company with principal executive offices located at 11/F, No. 3 Building, 700 Yishan Road, Shanghai, 200233, People's Republic of China. Defendant Giant is a leading developer and distributor of online games in China. The Company commenced operations in 2004 as a predecessor limited liability company in China named Shanghai Zhengtu Network Technology Co., Ltd., which changed its name to Shanghai Giant Network Technology Co., Ltd., in October 2007. In July 2006, defendant Shi and his daughter, Jing Shi, together with eighteen other individual shareholders, established the company in its current form as a Cayman Islands holding company to comply with Chinese laws restricting foreign ownership in China's online game industry.

18. Defendant Shi, a citizen of China, is the Chairman of the Board and founder of the Company. He also previously served as the Chief Executive Officer ("CEO") of the Company

5

until his April 2013 resignation. Defendant Shi is part of the Buyout Group, along with Baring Private Equity Asia ("Baring") and Hony Capital Fund V, L.P. ("Hony").

19.     Defendant Wei Liu ("Liu"), a citizen of China, has been a director of the Company since October 2006 and CEO of the Company since April 2013. Liu was previously the president of the Company from 2007 until 2013.

20.     Defendant Xuefeng Ji ("Ji"), a citizen of China, has been a director and president of the Company since April 2013. Prior to his elevation to this position, Ji was the Senior Vice President of Product Development for the Company.

21.     Defendant Andrew Y. Yan ("Yan"), a citizen of Hong Kong, has been a director of the Company since 2006.

22.     Defendant Peter Andrew Schloss ("Schloss"), a citizen of China, has been a director of the Company since 2007.

23.     Defendant Jason Nanchun Jiang ("Jiang"), a citizen of China, has been a director of the Company since 2007.

24.     The defendants named above in ¶¶ 18-23 are sometimes collectively referred to herein as the "Individual Defendants."

25.     Defendant Parent is an exempted company with limited liability incorporated under the laws of the Cayman Islands.

26.     Defendant Merger Sub, a wholly-owned subsidiary of Parent, is an exempted company with limited liability incorporated under the laws of the Cayman Islands.

6

## CLASS ALLEGATIONS

27. Plaintiff brings this action for himself and on behalf of all other public holders of Giant ADSs that have been or will be harmed by Defendants' conduct as described herein (the "Class"). Excluded from the Class are Defendants and any individual or entity affiliated with any Defendant.

28. This action is properly maintainable as a class action.

29. The Class is so numerous that joinder of all members is impracticable. According to the Merger Agreement, as of March 12, 2014, there were 240,256,872 shares of the Company (including both common shares and ADSs) issued and outstanding.

30. There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include the following:

(a) whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, good faith, diligence, fair dealing, independence, and/or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(b) whether the Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(c) whether the Individual Defendants are conflicted or otherwise engaging in self-dealing in connection with the Proposed Transaction;

(d) whether the Individual Defendants have breached any of their other fiduciary duties owed to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

7

(e) whether the Individual Defendants are unjustly enriching themselves and/or the other insiders/affiliates of Giant in connection with the Proposed Transaction;

(f) whether the Individual Defendants, in bad faith and for improper motives impeded or erected barriers designed to discourage other potentially interested parties from making an offer to acquire the Company or its assets;

(g) whether Giant aided and abetted any of the Individual Defendants' breaches of fiduciary duty owed to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(h) whether Parent or Merger Sub aided and abetted any of the Individual Defendants' breaches of fiduciary duty owed to Plaintiff and the other members of the Class in connection with the Proposed Transaction; and

(i) whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated without the actions complained of herein being corrected.

31. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

32. Plaintiff has retained competent counsel experienced in litigation of this nature and will fairly and adequately represent and protect the interests of the Class.

33. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants.

8

34.     Plaintiff anticipates that there will be no difficulty in the management of this litigation as a class action. Indeed, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

35.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

36.     Under the law of the Cayman Islands, which is substantially similar to New York law concerning breach of fiduciary duty claims, the officers and directors of a publicly traded corporation have fiduciary duties of loyalty and care to shareholders. To diligently comply with these duties, neither the officers nor directors may take any action that:

(a) adversely affects the value provided to the corporation's shareholders;

(b) will discourage, inhibit, or deter alternative offers to purchase control of the corporation or its assets;

(c) contractually prohibits themselves from complying with their fiduciary duties;

(d) will otherwise adversely affect their duty to secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e) will provide the officers and/or directors with preferential treatment at the expense of, or separate from, the public ADS holders.

37.     In accordance with their duties of loyalty, the Individual Defendants, as officers and/or directors of Giant, are obligated to refrain from:

(a) participating in any transaction where the officers' or directors' loyalties are divided;

9

(b) participating in any transaction where the officers or directors receive, or are entitled to receive, a personal financial benefit not equally shared by the public ADS holders of the corporation; and/or

(c) unjustly enriching themselves at the expense or to the detriment of the public shareholders.

38. Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties and aiding and abetting such breaches, including their duties of loyalty, good faith, and independence owed to Plaintiff and the other public ADS holders of Giant. Certain of the defendants stand on both sides of the transaction, are engaging in self-dealing, and are obtaining for themselves personal benefits, including personal financial benefits not shared equally by Plaintiff or the Class (as defined herein). Accordingly, the Proposed Transaction will benefit the Individual Defendants in significant ways not shared by the Class members. As a result of the Individual Defendants' self-dealing and divided loyalties, neither Plaintiff nor the Class will receive adequate or fair value for their Giant ADS holdings in the Proposed Transaction.

39. Because the Individual Defendants are knowingly or recklessly breaching their duties of loyalty, good faith, and independence in connection with the Proposed Transaction, the burden of proving inherent or entire fairness of the Proposed Transaction, including all aspects of its negotiation, structure, price, and terms, is placed upon defendants as a matter of law.

## BACKGROUND

40. Giant, headquartered in China, is an online game developer and operator focusing on massively multiplayer online role-playing games. The Company has built a nationwide distribution and marketing network to sell and market its prepaid game cards and game points. As

10

of December 31 2012, its distribution network consisted of more than 11 non-exclusive regional distributors and reached over 99,000 retail outlets.

41. In addition to its presence in the growing online game industry, the Company also operates in the webgames and mobile games sectors.

42. Although substantially all of the Company's revenues are generated through its own game operations in China, it also derives revenues from licensing its games to third party operators in other territories, including Southeast Asia, South Korea, North America, Europe, Russia and other Russian-speaking territories.

43. As a developer of MMORPGs, the Company has certain proprietary server technology that enables a greater number of players to simultaneously interact with each other in its games.

44. Over the last several financial quarters, the Company has reported impressive and sustained growth. On May 7, 2013, Giant announced that, for the first fiscal quarter ended March 31, 2013:

- Net revenue of USD $92.2 million, up 12.6% compared to the same quarter, previous year;
- Basic and diluted earnings per ADS of USD $0.22 and USD $0.21, respectively;
- Net income attributable to the Company's shareholders of USD $52.5 million, up 294.3% quarter over quarter and 11.6% year over year.

45. Commenting on these results, defendant Liu stated:

We are thrilled with this solid start to 2013. . . 2013 is positioned to be a year of excitement and transformation as we implement key strategic initiatives to strengthen our already formidable game development capability and further diversify our game portfolio . . . Given the strong performance of our existing games and the implementation of our key strategic initiatives, together with our unique studio incentive structure and other operational systems in place, we are confident that we will continue to deliver results and give value back to our shareholders such as our regular semi-annual dividends.

11

46. For the second quarter of fiscal 2013, the Company's performance again impressed,

announcing:

- Net revenue of USD $95.8 million, up 2.7% quarter over quarter and 11.3% year over year;
- Basic and diluted earnings per ADS of USD $0.25 and USD $0.24, respectively;
- Net income attributable to the Company's shareholders of USD $59.9 million, up 12.7% quarter over quarter and up 19.6% year over year.

47. In her comments on the results, defendant Liu touted the future of the Company:

We are also on track to strategically expand into new high growth areas such as webgames and mobile games. We plan to launch two webgames in the second half this year. In addition, we made good progress in our new mobile game development and plan to release our first in-house developed mobile game soon. We hope that these new games will start to contribute to revenue in the fourth quarter this year and become a milestone which leads to sustainable and diversified growth in the years to come.

48. The Company continued its upward trajectory and expansion in the third quarter,

as illustrated by the financial results announced on November 6, 2013, less than one month before

the initial public proposal by the Buyout Group to purchase the Company:

- Net revenue of USD $96.5 million, up 0.3% quarter over quarter and 8.6% year over year;
- Basic and diluted earnings per ADS of USD $0.24 and USD $0.23, respectively;
- Net income attributable to the Company's shareholders of USD $58.1 million, down 3.2% quarter over quarter, but up 14.1% year over year.

49. As a result, defendant Liu lauded the Company's performance and its position in

China:

Giant is today the premier content provider in the online game market in China. Looking ahead into 2014, we have a robust MMO pipeline, webgames will begin contributing to our top line, and we will launch several mobile games. We will continue our collaboration with third-party platforms while exploring newer and more cost effective distribution channels. We will achieve these goals while maintaining our industry-leading profitability driven by prudent spending and continuously improving efficiency. In the mid-to-long-term, with the support of strong teams of developers led by our industry-known chief producers, and a diversified portfolio in the pipeline, we view our market position and financial

12

outlook as brighter than ever. We will strive to keep the growth momentum and seize the opportunities that will come to fruition.

50.     The Company capped its progressive year with a strong fourth quarter, announcing

on March 5, 2014 that it had achieved positive financial results:

- Net revenue of USD $99.9 million, up 2.5% quarter over quarter and 5.8% year over year;
- Basic and diluted earnings per ADS of USD $0.14 and USD $0.14, respectively;
- Net income attributable to the Company's shareholders of USD $33.6 million, down 42.8% quarter over quarter, but up 146.2% year over year.

51.     The full year numbers were even more impressive when compared to 2012, as it

showed the Company had turned a corner and solidified itself in the expanding Chinese game

market:

- Net revenue increased 9.5% to USD $389.1 million;
- Gross Profit increased 10.4% to USD $339.8 million;
- Gross profit margin was an astonishing 87.3%;
- Net income attributable to the Company's shareholders increased 26.1% to USD $207.0 million;
- Basic and diluted net income per ADS increased 24.5% and 23.0%, respectively, to USD $0.86 and USD $0.84, respectively.

52.     The Company's success was undeniable and defendant Liu acknowledged as much

in her comments:

2013 marked another year of consistent and strong growth. We have delivered double-digit annual growth in online game revenue as compared to fiscal year 2012, and sequential quarter-over-quarter growth for the pas sixteen consecutive quarters. . . Mobile games have become a major strategic growth focus for us and we expect some of our prior investments will begin to bear fruit in 2014 . . . As we continue to grow in the traditional PC segment while investing in mobile opportunities, we will continue to spend prudently and remain the leader in profitability. We are confident that 2014 will be another banner year for Giant.

53.     All of this positive news helped the Company cement itself as a key player in a

booming Chinese online gaming market. Analysts estimate that the Chinese online gaming market

has exploded from USD $10 million in 2001 to USD $9.7 billion in 2012, and predicted that it

13

would reach USD $11.0 billion by the end of 2013, on the advancements in mobile gaming network speed and service and increased use by the Chinese youth.

54. Yet, despite the future looking so bright for the Company and its shareholders, the Individual Defendants decided less than two weeks later to enter into the Merger Agreement and allow defendant Shi to take the Company private, effectively locking out any ADS holder from the Company's future success.

## THE PROPOSED TRANSACTION

55. Despite the Company's bright future, on March 16, 2014, the Company announced that it had entered into the Merger Agreement, whereby Parent and Merger Sub would take the Company private and cash out all public ADS holders for $12.00 per ADS.

56. The press release announcing the Proposed Transaction states in pertinent part:

### GIANT INTERACTIVE GROUP ENTERS INTO DEFINITIVE MERGER AGREEMENT FOR GOING PRIVATE TRANSACTION

SHANGHAI, PRC   March 16, 2014 -- Giant Interactive Group Inc. (GA) ("Giant" or the "Company"), one of China's leading online game developers and operators, announced today, March 17, 2014 in Shanghai, China that it has entered into a definitive Agreement and Plan of Merger (the "Merger Agreement") with Giant Investment Limited ("Parent") and Giant Merger Limited, a wholly owned subsidiary of Parent ("Merger Sub").

Pursuant to the Merger Agreement, Parent will acquire the Company for cash consideration equal to US$12.00 per ordinary share of the Company (each, a "Share") and US$12.00 per American Depositary Share of the Company, each representing one Share (each, an "ADS"), or approximately US$3.0 billion in aggregate cash consideration. This represents an 18.5% premium over the closing price of US$10.13 per ADS as quoted by the New York Stock Exchange (the "NYSE") on November 22, 2013, and a premium of 31.6% and 33.6%, respectively, over the Company's 30- and 60- trading day volume-weighted average price as quoted by the NYSE prior to November 22, 2013, the last trading day prior to the Company's announcement on November 25, 2013 that it had received a non-binding "going private" proposal from the chairman of the board of directors of the Company, Mr. Yuzhu Shi (and certain of his affiliated entities), and an affiliate of Baring Private Equity Asia (Baring Private Equity Asia together with funds

14

managed and entities controlled by it, "Baring"), to acquire all of the outstanding Shares, including Shares represented by ADSs, not already owned by them.

The consideration to be paid to holders of Shares and ADSs pursuant to the Merger Agreement also represents an increase of approximately 2.1% from the original US$11.75 per Share and US$11.75 per ADS offer price in the November 25, 2013 "going private" proposal.

Immediately following the consummation of the transactions contemplated by the Merger Agreement, Parent will be beneficially owned by a consortium (the ""Buyer Group"") comprising a company owned by Mr. Shi, an affiliate of Baring and an affiliate of Hony Capital Fund V, L.P. (Hony Capital Fund V, L.P., together with funds managed and entities controlled by it, "Hony Capital"). As of the date of the Merger Agreement, the members of the Buyer Group beneficially own in aggregate approximately 49.3% of the issued and outstanding Shares.

Subject to the terms and conditions of the Merger Agreement, at the effective time of the Merger, Merger Sub will merge with and into the Company, with the Company continuing as the surviving corporation and a wholly owned subsidiary of Parent (the "Merger"), and each of the Shares issued and outstanding immediately prior to the effective time of the Merger (including Shares represented by ADSs) will be cancelled in consideration for the right to receive US$12.00 per Share or US$12.00 per ADS, in each case, in cash, without interest and net of any applicable withholding taxes, except for (i) up to 59,890,972 Shares held by Union Sky Holding Group Limited, a company owned by Mr. Shi ("Union Sky"), 11,800,000 Shares held by Baring Private Equity Asia Holding (12) Limited, a company owned by Baring ("Baring SPV", and together with Union Sky, the "Rollover Shareholders"), and Shares held by Parent, the Company or any of their subsidiaries immediately prior to the effective time of the Merger, which Shares will be cancelled without payment of any consideration or distribution therefor, (ii) Shares owned by holders who have validly exercised and not effectively withdrawn or lost their rights to dissent from the Merger pursuant to Section 238 of the Companies Law of the Cayman Islands, which Shares will be cancelled at the effective time of the Merger for the right to receive the fair value of such Shares determined in accordance with the provisions of Section 238 of the Companies Law of the Cayman Islands, and (iii) 37,500,000 Shares held by Union Sky immediately prior to the effective time of the Merger, which will be cancelled in exchange for Union Sky's right to receive a promissory note to be issued to Union Sky in the aggregate principal amount of US$450,000,000, which is equal to the product of (a) 37,500,000 and (b) US$12.00, which note will be issued by the Company and bear simple interest at two percent per annum. As a result of the transactions contemplated by the Merger Agreement, Mr. Shi will retain approximately one-half of his pre-transaction beneficial ownership in the Company, while selling the remainder for cash and a promissory note based on the same price per Share and per ADS as is to be paid to unaffiliated holders of Shares and ADSs, respectively, in the Merger.

\* \* \*

The Company's board of directors, acting upon the unanimous recommendation of the special committee formed by the board of directors (the "Special Committee"), unanimously approved the Merger Agreement and the transactions contemplated by the Merger Agreement, including the Merger, and resolved to recommend that the Company's shareholders authorize and approve the Merger Agreement and the transactions contemplated by the Merger Agreement, including the Merger. The Special Committee, which is composed solely of independent directors of the Company who are unaffiliated with Parent, Merger Sub or any member of the Buyer Group or management of the Company, exclusively negotiated the terms of the Merger Agreement with the Buyer Group with the assistance of its independent financial and legal advisors.

Under the terms of the Merger Agreement, the Company is not permitted to pay any dividends or repurchase any Shares pending consummation of the Merger. As a result, the Company's board of directors has suspended the Company's previously announced share repurchase program and dividend policy.

The Merger, which is currently expected to close during the second half of 2014, is subject to customary closing conditions, including the approval by an affirmative vote of holders of Shares representing at least two-thirds of the Shares present and voting in person or by proxy as a single class at a meeting of the Company's shareholders, which will be convened to consider the authorization and approval of the Merger Agreement and the transactions contemplated by the Merger Agreement, including the Merger, and the other closing conditions specified in the Merger Agreement. As of the date of the Merger Agreement, the Rollover Shareholders and Vogel Holding Group Limited, a wholly-owned subsidiary of Union Sky ("Vogel"), beneficially own in aggregate approximately 49.3% of the issued and outstanding Shares. Pursuant to a support agreement among the Rollover Shareholders, Vogel, Parent and Giant Group Holdings Limited, the sole shareholder of Parent, the Rollover Shareholders and Vogel have agreed to vote all their Shares and ADSs in favor of the authorization and approval of the Merger Agreement and the transactions contemplated by the Merger Agreement, including the Merger. If completed, the Merger will result in the Company becoming a privately-held company and ADSs will no longer be listed on the NYSE.

\* \* \*

## THE UNFAIR PROCESS

57.    The Proposed Transaction is the product of a calculated and multi-month process

whereby defendant Shi sought to take Giant private without providing adequate compensation to

the Company's minority public ADS holders.

58. On November 25, 2013, the Company announced that it had received a proposal from the Buyout Group to acquire the Company for $11.75 per ADS. The offer was unexpected, not just because of the paltry premium it offered, but because just five months earlier, defendant Shi announced that he would be selling more than 11 million shares of the Company (or 6% of his stake) at a price of $7.25 per ADS. This transaction represented the first share sale by Shi since the Company went public in 2007 and the Company cited it as an opportunity for defendant Shi to "diversify his personal holdings."

59. In a letter to the Company's board, the Buyout Group stated that it did "not intend to sell their stake in the Company to any third party," effectively signaling that this was basically a take-it-or-take-it deal for the Board; either they could accept the inadequate offer price or they could decline it, thereby angering the Buyout Group, comprised of the Board's chairman and which already nearly owned enough of the Company to take it by force.

60. The public announcement had a second very real effect—the Company could now claim any final consideration as a premium against the price of the Company as of this November announcement. This effectively curbed any future increase in share price and an illusory premium could then be touted vis-à-vis this "unaffected" price, completely disregarding the fact that the Company's ADS price had risen 82% in the year leading up to that date.

61. In response to the public proposal to acquire the Company, the Company announced on December 2, 2013 that it was creating a special committee (the "Special Committee") comprised of the purportedly independent members of the Company's Board—Schloss, Yan, and Jiang. The Special Committee was tasked with considering the November offer from the Buyout Group.

17

62.     The independence of the Special Committee is certainly in question as Jiang is a co-founder of Yunfeng Capital ("Yunfeng"), a Chinese private equity firm that raised $1.5 billion in its debut fund in 2011 and has targeted investment in technology, media and telecommunications related companies. Defendant Shi is also a co-founder of Yunfeng and the tangled web of Jiang and Shi's relationship and financial involvement certainly creates a cloud of suspicion around Jiang's independence. Furthermore, it was recently announced that Yunfeng is raising up to $1 billion in its second fund, with defendant Shi already contributing $20 million.

63.     Unfortunately, this is not the first time the Company, Shi, and Yunfeng have crossed paths, as in September 2011, the Company, then under the stewardship of Shi, moved $20 million from Giant's balance sheet to purchase "unregistered" shares of Alibaba Group Holding Ltd. (a Chinese company owned by Yunfeng's co-founder Jack Ma). Instead of purchasing the shares above board and making the necessary reporting, the Company chose to buy through Yunfeng—a decision exacerbated by the fact that this investment in Yunfeng has accounted for eighty percent of the equity investment losses of the Company.

64.     The Special Committee was a sham, as the end result was never in doubt. The Company and the supposedly independent directors were squarely under the thumb of Shi and they were willing to accept anything he and the Buyout Group were willing to offer.

65.     Because a sudden spotlight was cast upon the Company and the Buyout Group by the financial media as a result of the November offer, and because the $11.75 offer price and supposed premium continued to pale in the face of the rising ADS price, the Buyout Group increased their offer to the $12.00 agreed to in the Merger Agreement—just a 5.3% premium over the Company's March 14, 2013 closing price.

18

66. Without any effort to inform itself as to the true value of the Company, the Board agreed to the Proposed Transaction on March 16, 2014; sealing the fate of the Company as a public entity and denying the Company's minority public ADS holders the chance to capitalize on the continued growth of the online gaming market in China.

## THE CONFLICTED DIRECTORS

67. That, of course, is not to say that the Individual Defendants were not all handsomely compensated for their capitulation.

68. For selling out the ADS holders that he had relied upon for the past 7 years to drive his Company forward and bankroll his personal investments, defendant Shi will take control of the entire Company for a pittance.

69. As illustrated by the chart below, as of December 31, 2012, each Individual Defendant had significant holdings in the Company via restricted shares and options, all of which will no longer be subject to restrictions and are currently "in the money" as related to the Proposed Merger Consideration, respectively, thus making them eligible for the Proposed Merger Consideration, resulting in a significant windfall for the holders.

| Director | Number of Restricted Shares | Number of Options | Total Cash to be Received |
| --- | --- | --- | --- |
| Wei Liu | 1,000,000 | 608,500 | $19,302,000.00 |
| Xuefeng Ji | 2,000,000 | 500,000 | $30,000,000.00 |
| Andrew Y. Yan | 50,000 | 500,000 | $6,600,000.00 |
| Jason Nanchun Jiang | 50,000 | 50,000 | $1,200,000.00 |
| Peter Andrew Schloss | 50,000 | 60,000 | $1,320,000.00 |

** Figures as of December 31, 2012

70. Without the Proposed Transaction, these securities instruments would be subject to certain restrictions and vesting periods, which they now shed. The financial benefits to be reaped as a result of the Proposed Transaction for the Individual Defendants are surely not being shared

19

by the public holders of the Company's ADSs, in breach of the Individual Defendants' fiduciary duties.

## THE PRECLUSIVE DEAL PROTECTION DEVICES

71.     The Proposed Transaction is also unfair because, as part of the Merger Agreement, the Individual Defendants agreed to certain onerous terms and preclusive deal protection devices that operate to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

72.     Specifically, section 6.04(i) of the Merger Agreement contains a strict "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by the Buyout Group. As if that were not restrictive enough, section 6.04(ii) requires that the Company discontinue any ongoing discussions or negotiations with any third party in furtherance of a sale.

73.     Furthermore, section 6.04(iv) explicitly states that the Company shall not "*grant any waiver, amendment or release under any standstill, confidentiality or similar agreement or Takeover Statutes* (and the Company shall promptly take all action necessary to terminate or cause to be terminated any such waiver previously granted with respect to any provision of any such confidentiality, standstill or similar agreement or Takeover Statute *and to enforce each such confidentiality, standstill and similar agreement.*" (emphasis added). This unnecessary contract provision prohibits other potentially interested parties from entering the bidding for Giant and creating a competitive auction process through with the Individual Defendants can maximize value for the benefit of the Company's ADS holders.

74.     Pursuant to section 6.04(a), should a third party bidder emerge for the Company and make an unsolicited offer, Giant must inform the Buyout Group within forty-eight hours of

20

that bidder's identity and offer, thus allowing the Company to capitalize on any due diligence that the third party may perform. Additionally, section 6.04(d) provides that, before the Company can accept a third party bid, it must negotiate with the Buyout Group for five days in an effort to render the superior third party bid no longer superior. Accordingly, no rival bidder is likely to emerge and act as a stalking horse because the Merger Agreement unfairly assures that any "auction" will end in favor of the Buyout Group and piggy-back upon the due diligence of the foreclosed second bidder.

75.     Section 8.06 of the Merger Agreement also provides for a termination fee of $40,275,000 to be paid by the Company to the Buyout Group in the event that it chooses to pursue an alternative offer, thereby requiring that a competing bidder not only jump all of the preclusive hurdles before being able to even make a bid, but then they must also pay a naked premium just to provide the Company with a superior offer.

76.     Compounding matters, defendant Shi and the Buyout Group, through their affiliates, have executed a support agreement ("Support Agreement"), providing that, among other things, all 49.3% of shares held by the Buyout Group will be voted in favor of the authorization and approval of the Proposed Transaction.

77.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The narrow circumstances under which the Board may respond to alternative proposals and the Company's inability to terminate the Merger Agreement if it accepts a superior proposal fail to provide an effective "fiduciary out" under the Merger Agreement.

21

78.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's ADS holders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duties
### (Against All Individual Defendants)

79.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

80.     The Individual Defendants' recommendation of the Proposed Transaction will result in a change of control of the Company, which imposes heightened fiduciary responsibilities to maximize Giant's value for the benefit of the ADS holders and requires enhanced scrutiny by the Court.

81.     By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants are attempting to deprive unfairly Plaintiff and other members of the Class of the true value of their investment in Giant, or have otherwise failed to secure the best price reasonable under the circumstances for Plaintiff and other members of the Class.

82.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants have breached their fiduciary duty of due care owed to the public ADS holders of Giant.

83.     As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not received and will not receive their fair portion of the value of Giant's assets and will be prevented from benefiting from a value-maximizing transaction.

22

84.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

## COUNT II
## Aiding and Abetting
## (Against Giant, Parent, and Merger Sub)

85.     Plaintiff repeats and realleges each allegation set forth herein.

86.     As alleged in more detail above, Giant, Parent, and Merger Sub have aided and abetted the Individual Defendants' breaches of fiduciary duties.

87.     As a result, Plaintiff and the Class members are being harmed.

88.     Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)     Declaring this action to be a proper class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

(B)     Declaring that the Individual Defendants have breached their fiduciary duties;

(C)     Declaring that the Merger Agreement and Proposed Transaction were entered into in breach of the Individual Defendants' fiduciary duties and is therefore unlawful and unenforceable;

(D)     Preliminarily and permanently enjoining Defendants and all those acting in concert with them from consummating the Proposed Transaction or performing the same until

23

such time, as any, that the Individual Defendants have adequately undertaken all appropriate and available methods to maximize shareholder value;

(E)     In the event that the Proposed Transaction is consummated prior to the entry of this Court's final judgment, rescinding the Merger Agreement and Proposed Transaction, and/or awarding actual and punitive damages, with pre- and post-judgment interest to Plaintiff and the other members of the Class;

(F)     Directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(G)     Awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(H)     Granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

DATED:     March 27, 2014                    Respectfully Submitted,

**LEVI & KORSINSKY, LLP**

Shane Rowley
30 Broad Street, 24th Floor
New York, NY 10004
Tel:     (212) 363-7500
Fax:     (866) 367-6510
Email: srowley@zlk.com;

*Attorney for the Plaintiff*

24